## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| CAMERON JOSEPH COOPER, | ) | |
| | ) | Case No. 3:20-cv-362 |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| COCA-COLA CONSOLIDATED, INC., *et al.*, | ) | Magistrate Judge Poplin |
| | ) | |
| *Defendants*. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are the Motion for Summary Judgment [Doc. 33] by Coca-Cola Consolidated, Inc. ("CCCI"), and the Motion for Leave to File Additional Declaration [Doc. 46] of Cameron Joseph Cooper. For reasons that follow, CCCI's Motion for Summary Judgment [Doc. 33] will be **GRANTED**, Plaintiff's Motion for Leave to File Additional Declaration [Doc. 46] will be **DENIED AS MOOT**, and this case will be dismissed.

## I.    FACTUAL BACKGROUND

Plaintiff Cameron Cooper was hired by CCCI on March 29, 2016, as a Delivery Merchandiser. A Delivery Merchandiser is responsible for "delivering, merchandising, [and] maintaining company standards at customer locations," which includes, e.g., filling shelves and coolers, stocking displays, rotating products, and removing out of date and damaged products. [Doc. 34-1 at 1]. A Delivery Merchandiser also "[f]osters relationship with account personnel and provides superior customer service to all accounts serviced." [*Id.*]. The job requires "[e]xcellent customer service skills," and past job performance that reflects "dependability, initiative, professional demeanor, and the ability to exercise sound judgment." [*Id.*].

When he was hired, CCCI was aware that Plaintiff had Tourette's Syndrome, which causes him to have physical and verbal "tics." [Doc. 34-19 at 4]. A CCCI employee testified that at that time, he did not observe manifestations of Tourette's Syndrome other than a "woop" tic and some head movements. [*Id.* at 13]. The timeline is somewhat unclear, but CCCI eventually perceived that Plaintiff's verbal tics had progressed and that he involuntarily used racial slurs and profanity. This very rare symptom of Tourette's Syndrome is known as coprolalia and causes the individual to involuntarily make obscene and socially inappropriate vocalizations. Elodie M. Betances & Pauola Carugno, *Coprolalia*, National Library of Medicine (March 27, 2023), https://www.ncbi.nlm.nih.gov/books/NBK549763/.

Senior Director of Distribution Richard Youmins[1] testified that he first became aware of complaints about Plaintiff's offensive language roughly six months into his employment. [Doc. 34-19 at 16-17; Doc. 52-1 at 3]. Sometime around the summer of 2017, CCCI believed that Plaintiff's verbal tics had worsened to include profanity and a racial slur. [Doc. 34-19 at 9-13]. Around that time, CCCI met with Plaintiff about this perceived progression. [*Id.* at 12-13]. The meeting included Richard Youmins and Hope Hale of the Human Resources department. Youmins could not remember how Plaintiff described his condition at the time, but recalled that "it was obvious" and "[t]here wasn't a question on whether or not his tic had progressed at that point." [*Id.* at 14]. He further testified that he observed the tic during the meeting, including the word "nigger" and cursing. [*Id.* at 15].

Robert Seiter was Manager Area Sales for CCCI in Knoxville. [Doc. 34-2 at 1]. He did not supervise Delivery Merchandisers, but he was responsible for receiving and resolving customer complaints, including complaints concerning Delivery Merchandisers. [*Id.*]. He avers that he

---

[1] The parties refer to this individual as both "Richard Youmins" and "Richard Youmans." His deposition identifies him as the former. [Doc. 34-19 at 1].

received numerous and ongoing complaints from customers concerning Plaintiff, including his use of the N word and profanity in stores. [*Id.* at 2]. In August 2017, he avers that several managers of Family Dollar raised concern about Plaintiff's language and the negative impact it was having on their business. [*Id.*]. Also in August 2017, he recalls he and others received direct complaints from Dollar General Manager Brian Raymond. [*Id.*].

One of these complaints was in September 2017 from DG managers Raymond and Matt Irvin. [*Id.*]. They reported that, prior to September 1, 2017, a DG employee had observed Plaintiff during a delivery and stated he was "frequently and freely" using the N word. [*Id.* at 2; Doc. 34-4]. Mr. Irvin reported that he attempted to separate Plaintiff from store customers. [*Id.*]. Seiter avers that this incident was "representative" of the incidents and complaints that continued throughout Plaintiff's employment. [*Id.* at 3].

On September 5, 2017, Plaintiff submitted an FMLA request for leave. [Doc. 34-19 at 10; Doc. 34-4; Doc. 34-5]. Plaintiff testified that during the first leave period, he adjusted his medication, got a new neurologist, went to a counselor, and did acupuncture. [Doc. 34-16 at 96-97]. At the end of the leave period, CCCI perceived that the involuntary profanity and racial slurs were under control, and Plaintiff was allowed to return to work in his position as a Delivery Merchandiser. [Doc. 34-19 at 16-17].

From early 2018 through 2019, Seiter avers that he and his sales team routinely received complaints about Plaintiff's offensive language. [Doc. 34-2]. Despite being informed that the language was involuntary, several customers requested Plaintiff no longer service their stores. [*Id.* at 3]. On February 14, 2018, Taylor Rogers was with Plaintiff at a DG store in Alcoa, Tennessee. [Doc. 34-6]. He reported that as Plaintiff was servicing the store, a DG manager said she did not want to check him in because of his use of the N word. [*Id.*]. Rogers reportedly explained Plaintiff's

condition but the manager said it still affected her and that she did not want Plaintiff to come to the store alone. [*Id.*]. According to Rogers, the manager told two African American customers about Plaintiff's condition. [*Id.*]. One of the men allegedly said he was glad to know, because if he had heard this language otherwise, he would have "knocked his ass out." [*Id.*]. Rogers stated that he attempted to diffuse the situation and that the customers appreciated the explanation and said they would stay on the other side of the store until Plaintiff left. [*Id.*].

Scott Mueller testified that while he had not originally heard the N word in conversation with Plaintiff, by February 2018 he had begun to hear this racial slur and other words. [Doc. 34-17 at 5]. Sometime after the incident at the DG store in Alcoa, CCCI adjusted Plaintiff's route or schedule so that he would not be serving DG stores, at least not alone. [Doc. 34-17 at 6-7].

Plaintiff took another period of leave around May 2018 and submitted a short term disability claim. [Doc. 34-9]. On August 15, 2018, Plaintiff's physician Dr. Karen Mullins stated Plaintiff could return to work on August 20, 2018, and that his current restrictions were "needs to be present with another driver." [Doc. 34-9 at 6-7].

During this leave period, Plaintiff submitted an Accommodation Request Form on June 14, 2018. Due to his Tourette's Syndrome, he asked to be put on a truck with another driver "in the meantime while taking care of my situation." [Doc. 34-10]. Plaintiff returned to work, and from August 20, 2018, to September 19, 2018, Plaintiff was placed in a driver helper role, though his title did not change. [Doc. 34-18 at 5; Doc. 34-19 at 21]. This was a seasonal role, not a permanent position, and had a different pay scale. [*Id.* at 23]. In that position, the driver would do the check in with the customer store and handle those conversations, while the helper had "very minimal" interaction. [Doc. 34-17 at 8-9]. Mueller testified that Plaintiff did "fine" in that role, but that he

4

was still having the tic in the store, which was "loud with the continued vulgar language and the F you." [*Id.* at 9].

Seiter recalls the last incident occurring in Fall of 2019 at a Breadbox store. The "Breadbox" incident occurred on October 31, 2019. [Doc. 31-13]. The store manager complained that Plaintiff used offensive language while talking about another CCCI employee. [Doc. 34-2 at 3-4; Doc. 31-13]. Her allegations were not substantiated and were unrelated to Tourette's Syndrome. [*Id.*]. However, during the course of investigating the incident, Seiter avers that CCCI discovered that Plaintiff's offensive language was not under control, and that he was saying the N word "over and over throughout his daily route and in the presence of customers and consumers." [*Id.* at 4].

Richard Youmins testified that over the course of Plaintiff's employment, CCCI received multiple customer complaints about Plaintiff from different locations and that there had been other customers that were having concerns. [Doc. 34-19 at 23]. He testified the situation continued to progress and CCCI was working to navigate both customer concerns and Plaintiff's medical situation. [*Id.* at 18-19]. In his interactions with Plaintiff, he observed that the offensive language tic worsened during his employment and appeared to improve after he went on leave. [Doc. 34-19 at 28]. In speaking with Plaintiff, he witnessed the N word and "god damn" as prevalent tics in his speech. [*Id.* at 28-29]. As to those two terms, "[a]s time progressed, it became more frequent and more pronounced." [*Id.* at 29].

Human Resources Director Cathy Nuttall also testified to hearing profanity and other offensive language in her interactions with Plaintiff. [*Id.* at 19; Doc. 34-11]. Nuttall testified that the N word was heavily present, spoken in full, repeatedly. [Doc. 34-18 at 17]. Multiple other profanities were also used frequently. [*Id.* at 18]. She testified that based on the frequency, she

believed it was highly likely that those words were also being used with customers, and thus Plaintiff was not meeting the customer service demands of the company. [*Id.*].

Eventually, CCCI perceived that Plaintiff's coprolalia had worsened to the point that the "next best step" was moving him to a non-customer facing role. [Doc. 34-19 at 30]. CCCI did not corroborate the specifics of the October 2019 Breadbox complaint, but Nuttall testified it was a factor in the decision to move Plaintiff to a non-customer facing position. [*Id.* at 19]. This was because in the course of investigating the allegations, CCCI learned that Plaintiff was using the N word and saying "goddamn," etc. in stores. [*Id.* at 20]. Plaintiff had no other performance problems. [Doc. 34-18 at 26].

Plaintiff disputes certain aspects of CCCI's evidence regarding his verbal tics. He testified that the N word is one of his verbal tics, but the regularity "depends on the day" as well as his stress and anxiety levels. [Doc. 34-16 at 9]. After some questioning and clarification, Plaintiff testified that he uttered the N word and "bitch" as uncontrollable verbal utterances while in customer stores for CCCI and did so loudly enough that someone he was speaking with could hear it. [Doc. 42-2 at 11-12]. Plaintiff disputes that his use of the N word and profanity changed over the course of his employment. [Doc. 42-2 at 30].

On December 5, 2019, CCCI told Plaintiff he could either take another leave of absence or be reassigned/transferred to a warehouse position. [Doc. 34-16 at 19]. The warehouse position had a different pay structure. [Doc. 34-18 at 32]. While the base pay rate was lower, employees were paid time and a half for overtime, while the Delivery Merchandiser role had a higher hourly rate, but with calculated overtime. [*Id.* at 22-23].

Plaintiff requested that instead of the warehouse, he be considered for the Dollywood route, and requested that if he were moved to the warehouse, he be paid $20 per hour instead of $18.50.

6

[Doc. 42-2 at 6-7; Doc. 34-14] According to Plaintiff, the Dollywood route was not customer facing when he had previously done the route, and he believed it was open because someone had quit. [Doc. 42-2 at 29]. Youmins testified that prior to Plaintiff going to the warehouse, the Dollywood route became a customer-facing delivery point, with someone from the organization following the driver around. [Doc. 34-19 at 25-26]. Nuttall testified there were no other non-customer-facing or lower customer-facing routes at the time. [Doc. 34-18 at 4]. She testified that the Dollywood route was considered for Plaintiff, but the position was occupied. [Doc. 34-18 at 25]. Similarly, Mueller testified that the warehouse position was the only vacant position that would keep Plaintiff at roughly the same level of pay and use his specialty of having a commercial driver's license. [Doc. 34-17 at 14]. He testified that the only other non-customer facing positions would be entry-level loading jobs. [*Id.*].

On April 22, 2020, Plaintiff called CCCI to advise he was leaving for another job and would not be coming in for his shift that day. [Doc. 34-16 at 5-6; Doc. 34-15]. He called the warehouse manager shortly before his shift was set to begin and told him it was "nothing against y'all, but I've got another job." [Doc. 34-16 at 7-8].

Based on these allegations, Plaintiff filed his Complaint [Doc. 1-1] against Dolgencorp, LLC, d/b/a Dollar General Corporation, and a John Doe in the Circuit Court for Knox County, Tennessee. On August 15, 2020, Dolgencorp removed the action to this Court. [Doc. 1]. Plaintiff later filed an Amended Complaint [Doc. 19], adding Coca-Cola Consolidated, Inc. ("CCCI") as a defendant. Dolgencorp filed an Unopposed Motion to Dismiss [Doc. 43], stating the claims against it were resolved by agreement of the parties. That motion was granted on July 7, 2022. [Doc. 45].

The Amended Complaint [Doc. 19] asserts two claims against CCCI under the Americans with Disabilities Act Amendments Act of 2008: (1) failure to accommodate or engage in the

interactive process, and (2) retaliation. The Amended Complaint also alleges Plaintiff was constructively discharged, though this is couched as part of his failure to accommodate claim. [Doc. 19 at 11-12]. CCCI moves for summary judgment as to all claims. [Doc. 34]. In his response in opposition to summary judgment, Plaintiff stipulates to the dismissal of his retaliation claim. [Doc. 42 at 9]. Accordingly, the claims before the Court are failure to accommodate / engage in the interactive process and constructive discharge.

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material fact must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine

8

issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56).

The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III.  ANALYSIS

### A.  Failure to Accommodate

The ADA prohibits discrimination based on an employee's disability. 42 U.S.C. § 12112(a). "[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)); *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805 (6th Cir. 2020) ("[W]e apply the direct evidence test to resolve failure to accommodate claims.").

9

Contrary to Plaintiff's suggestion, the *McDonnell Douglas* burden shifting framework does not apply. *Morrissey*, 946 F.3d at 298.

> The Sixth Circuit uses a multi-part test in analyzing reasonable accommodation claims:
>
> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Tchankpa*, 951 F.3d at 805 (quoting *Kleiber*, 485 at 869). "Plaintiffs must also propose a reasonable accommodation to succeed." *Id.* There is no dispute that Plaintiff is disabled under the ADA. In dispute is whether Plaintiff was otherwise qualified for the Delivery Merchandiser position without accommodation or with a proposed reasonable accommodation.

CCCI contends that Plaintiff was not otherwise qualified for the position of Delivery Merchandiser due to uncontrollable outbursts of vulgarity and a racial slur. CCCI further argues that even if he were a qualified individual under the ADA, his failure to accommodate claim fails because he was in fact provided with reasonable accommodation by reassignment to the only non-customer facing position that was then available and roughly comparable. CCCI also argues that Plaintiff cannot show that CCCI failed to engage in the interactive process. Plaintiff responds that he was otherwise qualified for his position as a Delivery Merchandiser without accommodation, so his reassignment was unnecessary. Plaintiff argues in the alternative that he proposed multiple reasonable accommodations that were rejected. The Court addresses these contentions in turn.

### 1. **Otherwise Qualified**

The parties dispute whether Plaintiff's coprolalia rendered him unqualified to provide excellent customer service, but agree it was an essential function of his job as a Delivery

10

Merchandiser. CCCI argues that Plaintiff was not otherwise qualified for his position without accommodation because he could not provide excellent customer service due to involuntary utterances that included the N word and various profanities. [Doc. 34 at 12-13]. CCCI cites to (i) Plaintiff's testimony; (ii) the September 2017 DG complaint; (iii) the February 2018 incident at a DG store in Alcoa; (iv) the October 31, 2019, Breadbox complaint; and (v) the testimony of several directors of CCCI regarding their direct interactions with Plaintiff and information they received from customers and Plaintiffs' coworkers. Plaintiff disputes the number of documented complaints and disputes that his coprolalia was noticeable, contending he was able to perform the essential functions of his job without any accommodation. [Doc. 42 at 12].

It is apparent to the Court that a person who routinely interacts with customers and performs their duties in the presence of the general public cannot provide excellent customer service if they regularly and involuntarily use audible profanity and racial slurs. *See DiFrancesco v. Aramark Corp.*, Civ. Act. No. 04-5647, 2006 WL 8459587, *7 (E.D. Penn. March 15, 2006) ("We find as a matter of law that basic civility is an essential function of any job that requires interaction with the public."). Several courts have reached similar conclusions. In *Ray v. Kroger*, No. 03-12919, 2003 WL 23018292 (11th Cir. Dec. 17, 2003), the United States Court of Appeals for the Eleventh Circuit upheld the district court's determination that a plaintiff with Tourette's Syndrome had not shown he could perform the essential functions of his grocery store job, in which he inevitably interacted with the public. Similar to Plaintiff here, Ray involuntarily blurted out curse words or racial slurs on a daily basis. The court held that the district court had correctly determined that an "essential function" of his job at Kroger included "'interacting with customers without offending them' and that Ray was unable to perform this 'essential function.'" *Id.* at *4; *see Ray v. Kroger*, 264 F. Supp. 2d 1221 (S.D. Ga. 2003) ("It is undisputed that Ray's coprolalia

11

caused him to blurt out curse words and racial slurs, which are by their nature offensive."). And "it is well-settled that 'the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability." *Price v. Facility Mgmt. Grp., Inc.*, 403 F. Supp. 2d 1246, n.21 (N.D. Ga. 2005) (quoting *Ray v. Kroger Co.*, 264 F. Supp. 2d 1221, 1228 (S.D. Ga. 2003)).

Similarly, in *Taylor v. Food World, Inc.*, 133 F.3d 1419 (11th Cir. 1998), the court stated: "[I]t seems to us that inherent in the job of a utility clerk is the ability to carry out tasks of the job without offending customers." *Id.* at 1424. In *Taylor*, however, the plaintiff did not utter profanities or racial slurs. Rather, he spoke more loudly than necessary, engaged in constant repetitive speech, and tended to make inappropriate comments or ask personal questions of strangers, due to Asperger's disorder. There, the court found a fact issue as to whether the speech was offensive or inappropriate, and reversed the district court's grant of summary judgment for the former employer. *Taylor* does not suggest there is a fact dispute here, as the utterance of racial slurs and profanity, however involuntary, is objectively offensive in a customer service context where the general public is likely to be present.

It is undisputed that due to Tourette's Syndrome, Plaintiff involuntarily uttered racial slurs and profanities and did so while in CCCI customer stores. He testified that stress triggers his coprolalia, as does being irritated or angry. [Doc. 34-16 at 2, 4]. Plaintiff testified that his uncontrollable verbal outbursts include the N word and "bitch," and that he would say these words in customer stores for CCCI. [Doc. 42-2 at 13]. Asked if he said the N word out loud so that someone could "hear and understand" what he was saying, he testified:

> If talking to someone or, you know, blatantly having a conversation with them, yes, then my Tourette's syndrome, my disability, yes, I probably would -- could have said it or did say it.

12

[Doc. 34-16 at 9]. He testified that how frequently he would say it "depends on the day," on stress and other factors, and some days he might not say it at all. [*Id.* at 9-10]. He testified he never *yelled* the N word or any profanities in a customer store. [Doc. 42-2 at 8].

In Plaintiff's declaration, and alluded to in his deposition, is the suggestion that "most people cannot understand what word(s), if any is being produced as a result of my Tourrette's [sic] Syndrome unless and until they have been informed of the tic by myself or someone else with previous knowledge of the tic." [Doc. 42-5 at ¶ 6]. But "a plaintiff's internally contradictory deposition testimony cannot, by itself, create a genuine dispute of material fact." *Bush v. Compass Group USA, Inc.*, 683 F. App'x 440, 449 (6th Cir. 2017) (plaintiff consistently and repeatedly testified he could not perform his job requirements and so could not create a fact issue based on his own contrary testimony). Plaintiff testified he said these words loud enough so others could hear and understand. Plaintiff cannot create a fact dispute with his own testimony, nor can he contradict his prior testimony with a later contradictory averment.

In addition, CCCI cites three specific instances in which it learned that Plaintiff was using offensive language in customer stores. Plaintiff characterizes CCCI's evidence on this point as "manufactured complaints." [Doc. 42 at 4]. He argues that the lone documented complaint against Plaintiff in the entirety of his employment is the first complaint, made in September 2017 by DG managers. [Doc. 42 at 4]. Regarding that complaint, Seiter avers that DG managers reported Plaintiff was "frequently and freely" using the N word. [Doc. 34-2 at 2; Doc. 34-4]. This report came on the heels of informal complaints from DG in August 2017, as well as complaints from Family Dollar store managers. [*Id.*]. Plaintiff does not dispute that this occurred.

Second, CCCI cites a February 2018 incident at a DG store in Alcoa, Tennessee. As Plaintiff points out, this was not a complaint by a customer. Rather, the incident was brought to

13

CCCI's attention because Plaintiff's coworker, Taylor Rogers, believed Plaintiff had been discriminated against while servicing the store. CCCI claims that Plaintiff was "loudly" using the N word in the DG store. As Plaintiff points out, there is sparse support for this characterization in the record.[2] Nonetheless, Rogers's statement – which Plaintiff does not challenge – says the DG manager stated she was bothered by Plaintiff's use of the N word, even after she was informed that it was involuntary. [Doc. 34-6]. A customer in the store stated that if he had heard it without knowing of Plaintiff's disability, he would have "knocked his ass out." [*Id.*].

Next, CCCI relies on the "Breadbox" incident on October 31, 2019. The DG store manager's complaint was not based on Plaintiff's coprolalia, but on a contention that he called a coworker a "dumb fucking bitch" who needed to learn how to do her job. [Doc. 34-13]. As Plaintiff argues, these allegations were never substantiated and were not related to his disability. [Doc. 34-19 at 19]. But in the course of investigating, CCCI learned that Plaintiff was using offensive language in customer stores. CCCI spoke with a trainee named Caleb who was with Plaintiff for several days the week of the Breadbox incident. According to Nuttall, Caleb explained that Plaintiff had been using the N word and profanity during that week, including at the Breadbox store and on a street with predominantly African American owned or operated businesses. [Doc. 34-8 at 15-16, 20].

In addition, Nuttall directly observed heavy use of the N word, said in full, "over and over," as well as other profanities when talking with Plaintiff about the Breadbox incident. [Doc. 34-18 at 18-19]. Scott Mueller similarly testified that the Breadbox issue did not directly motivate the reassignment decision, but rather brought to light the reoccurring issue of Plaintiff's offensive

---

[2] Robert Seiter avers that it was "reported" sometime in February 2018 that Plaintiff was loudly using the N word in a DG store. [Doc. 34-2 at ¶ 9]. Though this is presumably the same incident, Seiter's affidavit does not include any dates or identify the person who made the complaint and there is no indication he heard it firsthand.

language. [Doc. 34-17]. He testified that when CCCI interviewed Plaintiff, the offensive language tic was frequent, "very fluid and consistent." [*Id.*].

Plaintiff argues there is a fact dispute as to the frequency and severity of the offensive language, as well as whether it was present during his entire employment with CCCI. First, Plaintiff contends that his verbal tics did not worsen or change during his employment with CCCI. [Doc. 42]. Rather, he testified his Tourette's symptoms always include the use of the N word and that he has had "those same verbal outbursts" his entire life. [Doc. 48-49]. As Plaintiff sees it, since CCCI believed he could deliver excellent customer service in the beginning of his employment and his tics never changed, he must have been able to perform his job through 2019. But whether his tics changed or not is not determinative of whether, at the time of his reassignment, he used offensive language in customer stores. So while the chronology of Plaintiff's symptoms may be disputed, it is not material.

Second, Plaintiff disputes that his coprolalia was apparent to those around him. He points out that in his deposition, counsel for CCCI stated that he could not hear the N word, though Plaintiff explained he had been saying it. [Doc. 42-2 at 8-9]. He also submitted a declaration indicating the N word tic had come out during the deposition, but appears to have been transcribed as the word "near." [Doc. 42-5 at 1]. But counsel's statements in a deposition are not evidence. In any event, whether Plaintiff's utterances were audible in his deposition has little bearing on whether he was qualified to perform the essential functions of his job in 2019. Again, Plaintiff does not dispute the September 2017 DG complaint and testified that he audibly used the N word and other profanities in customer stores.

Next, Plaintiff challenges CCCI's characterization of customer complaints as ongoing and numerous. Plaintiff attacks Seiter's affidavit as manufactured and self-serving, noting that only

15

four complaints were identified in CCCI's interrogatory responses. [Doc. 42 at 14; Doc. 42-1 at 8]. While the Court agrees that some of CCCI's evidence lacks detail, it has presented evidence that Plaintiff used offensive language in customer stores, that customers complained about the language, and that CCCI employees directly observed the language. In addition to the incidents discussed above, CCCI submitted a May 17, 2018, email in which Scott Mueller relays to Hope Hale and Richard Youmins that he met with Plaintiff. [Doc. 34-8]. The email indicates that they discussed "offending DG employees and customers," corroborating Seiter's statement that the complaints were ongoing. [*Id.*].[3]

Plaintiff also argues that performing his work "without receiving a single customer complaint" was not "an essential function of the delivery merchandiser position." [Doc. 42 at 14]. The Court agrees and CCCI has not argued otherwise. Customer complaints are simply one type of evidence that CCCI has adduced to demonstrate that Plaintiff could not perform the essential functions of his job because he could not avoid offending customers. And even assuming that only one formal complaint was made, CCCI could reasonably expect more complaints in the future. This is so even if the complaint was eventually resolved, which is not clear from the record. CCCI was not obligated to wait and see if more customers would complain before determining that Plaintiff could not provide excellent customer service due to uncontrollable offensive language. *See Foley v. Morgan Stanley Smith Barney, LLC*, No. 11-cv-62476, 2013 WL 795108, *6 (S.D. Fla. March 4, 2013) ("There is no requirement that an employer tolerate unprofessional behavior for a certain period before it is entitled to discharge an employee.").

Moreover, Plaintiff's Amended Complaint alleges multiple complaints against him from different Dollar General stores. [Doc. 19 at ¶¶ 15-16, 18-19, 22-23, 36]. "[A]dmissions in

---

[3] Plaintiff correctly notes, however, that the cited deposition testimony of Nuttall appears to be unrelated, while Mueller's testimony appears to relate to the email he sent.

16

pleadings are generally binding on the parties and the Court." *Kay v. Minacs Grp. (USA), Inc.*, 580 F. App'x 327 (6th Cir. 2014) (quoting *Ferguson v. Neighborhood Housing Servs.*, 780 F.2d 549, 551 (6th Cir. 1986)); *Davis v. LifeTime Capital, Inc.*, 740 F. App'x 820 (6th Cir. 2018) ("This Court has recognized that factual assertions in pleadings . . . unless amended, are considered judicial admissions conclusively binding on the party who made them." (citation omitted)). Plaintiff alleges that six months into his employment, the manager of a DG store in Oak Ridge, Tennessee, informed Coca-Cola management that "due to his disability," Plaintiff was no longer welcome in the store. [*Id.* at ¶ 15]. He alleges that the DG manager for the Amherst Road location in Knoxville, did the same shortly thereafter. [*Id.* at ¶ 16]. He characterizes these as "complaints," though couches them as complaints about his disability. [*Id.* at ¶ 17]. He alleges that after he returned from leave, a manager at the Bridgeway Drive Dollar General in Maryville also told CCCI that Plaintiff was not welcome, and several weeks later, someone at the William Blount Drive store did the same. [*Id.* at ¶¶ 18-19]. He alleges another incident on November 15, 2019, and further alleges that Dollar General contacted CCCI on "multiple occasions" regarding Plaintiff. [*Id.* at ¶ 23, 36]. He cannot now contend that only one relevant complaint was ever made during the entire course of his employment.

Plaintiff also attempts to establish a fact dispute as to whether he could provide excellent customer service by submitting declarations from former supervisors or managers: Bill Gruel, Chuck Bankston, Ryan Garrett, and Jeremy Fitzpatrick. Gruel and Bankston aver that Plaintiff provided excellent customer service and they received positive feedback regarding his performance. [Doc. 42-6; Doc. 42-7]. Garrett opined that Plaintiff's offensive language tics were not "easily decipherable," [Doc. 42-8], while Fitzpatrick opined that his tics would not be obvious to someone who did not already know what was being said [Doc. 42-9].

17

None of these declarations move the needle, for three reasons. First, there is no dispute that other than the offensive language, Plaintiff was a strong employee. The subjective opinion of Plaintiff's supervisors that he provided excellent customer service does not change the Court's determination: uncontrollably uttering audible racial slurs and profanities renders an employee unable to provide excellent customer service in a role that requires regular customer interaction inside a customer's business, with the general public likely to be present.

Second, Plaintiff argues the declarations of Plaintiff's supervisors cast doubt on the number of complaints actually made against Plaintiff. Plaintiff notes that according to Seiter, standard procedure for customer service complaints included notifying Plaintiff's supervisors. [Doc. 34-2 at ¶ 10]. Yet Gruel and Bankston were apparently only aware of the September 2017 complaint. As to Bankston, this is unsurprising because he left the company in September 2017, [Doc. 42-7], while Gruel only supervised Plaintiff at "intervals" from June 2017 to August 2021. [Doc. 42-6]. And Garrett recalled a DG store inquiring about Plaintiff's language before he left in May 2017. [Doc. 42-8]. Regardless, as the Court has explained, the number of complaints is not the only evidence relevant to whether Plaintiff could perform the essential functions of his job without offending customers.

Third, Garrett and Fitzpatrick's general opinion that Plaintiff's offensive language tics were not particularly noticeable does not change the fact that other people actually heard and understood it. Underscoring this point is the limited knowledge of the declarants: Garrett supervised Plaintiff during "periods" of his employment until May 2017, and Fitzpatrick was Plaintiff's supervisor only until the end of 2016, long before the relevant events.

Finally, Plaintiff moved for leave to file the declaration of Nathan Roberts. [Doc. 46]. In the Declaration, Roberts avers he was Plaintiff's supervisor from sometime in 2018 until Plaintiff's

transfer to the warehouse in December 2019. Due to his position, he believes he would have been made aware if a customer made a complaint about Plaintiff, and likely would have been one of the people responsible for handling the complaint. [*Id.* at ¶ 9]. He avers he never received a complaint about Plaintiff from customers or coworkers. [*Id.*].

Setting aside for the moment the purported issues with this declaration, it does not change the Court's determination as to whether Plaintiff was "otherwise eligible" for the Delivery Merchandiser role without accommodation. At minimum, the parties agree that DG made a complaint in September 2017. Nor is there a dispute as to whether Plaintiff used offensive language in CCCI stores, loud enough for others to hear and understand – he testified that he did. So Robert's opinion that the N word can only be deciphered "occasionally" in his speech and that he does not believe subsequent complaints were lodged does not create a fact dispute as to Plaintiff's eligibility.

The undisputed facts in the record show that Plaintiff audibly used the N word and profanity in customer stores while working for CCCI and that customers complained about this language. These involuntary utterances were objectively offensive and could not be controlled. The severity and frequency of the offensive language also varied, making it impossible to predict when someone might hear the language. Providing excellent customer service was an essential function of the Delivery Merchandiser role, which necessarily includes not offending customers with profanity and racial slurs. Plaintiff's job required not only interaction with customers of CCCI, but servicing stores where the general public would be present. At times he performed this job alone, without the benefit of a coworker to help prevent misunderstandings. Based on these circumstances, the Court finds that Plaintiff was not otherwise qualified for the Delivery Merchandiser position without accommodation.

## 2. Reasonable Accommodation

Even if Plaintiff were otherwise eligible for the Delivery Merchandiser position, he cannot show that CCCI failed to accommodate him because (i) CCCI provided a reasonable accommodation in transferring him to the warehouse, and (ii) Plaintiff has not identified a vacant position for which he was qualified. Plaintiff says he requested two accommodations: the Dollywood route or a bulk delivery route.

The ADA defines "reasonable accommodation" to include, *inter alia*, "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9). To determine whether an accommodation is reasonable, the employer must consider:

> (1) the particular job involved, its purpose, and its essential functions; (2) the employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee.

*Keever v. City of Middletown*, 145 F.3d 809 (6th Cir. 1998); 29 C.F.R. § 1630.9(a), appendix. However, "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996) (quoting 29. C.F.R. 1630, app'x at 415). An employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided. *Id.* To prevail, Plaintiff "must demonstrate a genuine issue of material fact with regard not only to [his] entitlement to [his] requested accommodation, but also as to the inadequacy of the offered alternatives." *Trepka v. Bd. of Educ.*, 28 F. App'x 455 (6th Cir. 2002) (affirming grant of summary judgment to defendant employer).

"In reasonably accommodating an employee under the ADA, 'the employer should first consider lateral moves to positions that are regarded as equivalent,' and 'may only consider lesser

jobs that constitute a demotion if there are no such equivalent positions available.'" *Dilley v. SuperValu, Inc.*, 296 F.3d 958, 964 (10th Cir. 2002) (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1177 (10th Cir. 1999)). "[I]f the employee cannot be accommodated in the current position and a comparable position is not available," the "employer may reassign an employee to a lower grade and paid position." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (1998); *Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 457 (6th Cir. 2004) ("In fact, where a comparable position is not vacant, an employer's obligation to reassign an employee may include an assignment to a position with a lower grade of pay."); *Brown v. Queen City Supply Co.*, 2021 WL 2635168 (S.D. Ohio, June 25, 2021) (offered position had a different pay structure and even if it paid less, was a reasonable accommodation, not a wrongful demotion).

Plaintiff says he proposed two positions as accommodation: the Dollywood route and a bulk delivery route. Whether Plaintiff's proposed accommodations were reasonable and whether CCCI was permitted to reassign him to a position with a lower wage both require the Court to determine whether these positions or a comparable position were vacant at the time of his request. It is somewhat unclear when he claims he requested these accommodations, and his opposition brief addresses vacancies as far back as 2017, long before the challenged reassignment. The Amended Complaint alleges: "Mr. Cooper requested a non-customer facing delivery route as an ADAAA reasonable accommodation . . . Instead, Mr. Cooper was presented with an ultimatum: transfer to the warehouse or be fired." [Doc. 19 at ¶ 70]. So the question is whether a comparable position or his proposed accommodation positions were vacant in December 2019, when Plaintiff alleges he requested accommodation and the decision was made to reassign him. The record reflects that the positions he proposed were not vacant at that time and indeed, no comparable, non-customer facing position was available.

21

First, as to the Dollywood route, Nuttall testified that the route was considered for Plaintiff, but it was occupied at the time. [Doc. 34-18 at 25]. She testified there were no other non-customer-facing or lower customer-facing routes at the time. [*Id.*]. Similarly, Scott Mueller testified that the warehouse position was the only vacant position that would keep Plaintiff at roughly the same level of pay and use his specialty of having a commercial driver's license. [Doc. 34-17 at 14]. The only other non-customer-facing positions that were available were entry-level loading jobs. [*Id.*].

Plaintiff attempts to rebut this showing with various declarations and his own testimony. Nathan Roberts avers that he was the supervisor of the Dollywood route at the time of his declaration in 2022. [Doc. 46-1]. He avers there were vacant routes during Plaintiff's employment, but does not identify them or provide any dates for these purported vacancies. Notably, as the supervisor of the Dollywood route, he does not say that this route was open when Plaintiff requested it in December 2019. Bill Gruel avers that at some point, Mueller and Youmins discussed removing Plaintiff from his position, and Gruel mentioned the Dollywood route as an option. [Doc. 42-6 at ¶ 7]. He believes the route was open, but fails to provide a time frame or reference point for the conversation. According to Chuck Bankston's declaration, management discussed the warehouse as an option for Plaintiff as early as September 2017, so the timing of any purported vacancy is material.

Plaintiff also testified as to his belief that the Dollywood route was open. He testified that an employee named Marlin Lane had quit, but they gave the job to someone else. [Doc. 42-2 at 29]. Again, Plaintiff provides no relevant dates or a basis for his belief that the position was open, other than his friendship with Marlin Lane. In addition, it appears that Mr. Lane occupied the secondary position on this route, which Scott Mueller testified depended on volume, even in full season. [Doc. 42-4 at 6-7]. So it is not clear that this was a full-time, year-round position in the

first place. Regardless, CCCI has presented testimony that at the time of Plaintiff's reassignment, the Dollywood route was not open and there were no other comparable, non-customer-facing positions vacant. Plaintiff's testimony on this score is speculative and none of his rebuttal evidence indicates a time frame during which the position was supposedly vacant. Plaintiff has failed to point to specific facts in the record that demonstrate there is a genuine issue for trial on this point.

Moreover, Richard Youmins testified that in late 2019, prior to Plaintiff's transfer to the warehouse, the Dollywood route became a customer-facing delivery point. [Doc. 34-19 at 25]. He testified that following a leadership change, the organization had someone "actually following our drivers around." [*Id.*]. Plaintiff went on the Dollywood route in some capacity prior to December 2019. He testified there was no "check-in and process" component to the route when he did it. [Doc. 42-2 at 26]. He conceded, however, that it could have changed later. [*Id.*]. While Nathan Roberts avers that the route has "almost zero" customer interaction, he does not address the check-in process, and, according to Plaintiff, the route originally involved no customer interaction at all. He also avers that the Dollywood route "to my knowledge has not materially changed in the past few years." [Doc. 46-1 at ¶ 10]. But the Roberts declaration appears to have been executed in August 2022, roughly a "few years" after the purported change to the route.

Plaintiff also says he requested a bulk delivery route, but testified there was no bulk delivery position open at the time. [Doc. 42-2 at 26]. The bulk delivery routes were still customer-facing in the sense that "you only talk to one person." [*Id.*]. Both Mueller and Nuttall testified that they did not believe the bulk delivery route was a viable option for Plaintiff because there was still customer interaction. [Doc. 34-18 at 13; Doc. 34-17 at 15]. Nuttall explained that the receiver is the gatekeeper for a store, and they did not want someone to reject a delivery. [Doc. 34-18 at 13]. Moreover, receivers could periodically request an audit, at which point the driver and customer

would work together to take every single pallet off the truck. [*Id.*]. So this role was, to some extent, still customer-facing according to CCCI. [*Id.* at 13-14]. Regardless, Plaintiff presents no evidence that a bulk delivery route was vacant at the relevant time.

"An ADA plaintiff bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Talley*, 542 F.3d at 1108 (6th Cir. 2008); *Tchankpa v. Ascena Retail Grp.*, 951 F.3d 805, 812 (6th Cir. 2020) ("Plaintiffs must also propose a reasonable accommodation to succeed."). A reasonable accommodation can include "reassignment to a <u>vacant</u> position." ADA § 12111(9) (emphasis added); *Kleiber*, 485 F.3d at 869. CCCI has pointed to specific testimony in the record that the positions Plaintiff requested were not available when the decision was made to reassign him, and indeed, no comparable position that was non-customer facing was available at the time. Plaintiff has not rebutted this showing by pointing to specific evidence in the record that puts this fact in dispute. Accordingly, Plaintiff has not shown that he proposed an objectively reasonable accommodation. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862 (6th Cir. 2007) (affirming dismissal of failure to accommodate claim where, *inter alia*, plaintiff failed to show that employer was hiring or seeking applications for the proposed position during the relevant time period).

For the same reason, Plaintiff has not rebutted CCCI's showing that it provided a reasonable accommodation in reassigning Plaintiff to the warehouse. Even if Plaintiff's proposed accommodation was objectively reasonable and the position(s) vacant, "[i]t is well-settled that 'an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided.'" *Keever v. City of Middletown*, 145 F.3d 809 (6th Cir. 1998); *Talley*, 542 F.3d at 1108 ("Importantly, an employee cannot force her employer to provide a specific accommodation if the employer offers another reasonable accommodation."). Because no

comparable position was available, CCCI was permitted to reassign Plaintiff to a position with a lower grade of pay as a reasonable accommodation. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (1998) (reasonable accommodation may include reassignment to lower grade and paid position if comparable position is not available); *Hedrick*, 355 F.3d at 457.[4] Accordingly, Plaintiff has not shown that CCCI's accommodation was unreasonable, nor has he shown that he proposed an objectively reasonable accommodation that was rejected. Thus, even if he were "otherwise eligible" for the Delivery Merchandiser role, he cannot make out a claim for failure to accommodate.

### 3. Interactive Process

Plaintiff's opposition brief does not address his allegations that CCCI failed to engage in the interactive process. "[The Sixth Circuit's] jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 Fed. App'x 368, 372 (6th Cir. 2013); *see also Pickett v. Johnson*, No. 1:13-cv-321, 2015 WL 5734921 *7 (E.D. Tenn. Sept. 30, 2015) (claim deemed abandoned where plaintiff failed to address it in his response in opposition to summary judgment motion). To the extent the Complaint asserts failure to engage in the interactive process as a separate claim, Plaintiff has abandoned it and that claim will be **DISMISSED**.

---

[4] The parties dispute whether the warehouse role actually paid less. Nuttall explained that the warehouse position had a different pay structure than the Delivery Merchandiser role. [Doc. 34-18 at 32]. According to Nuttall, Delivery Merchandiser wage was a day rate with calculated overtime and was about a 50-hour work week. [*Id.*]. The warehouse was time and a half pay over 40 hours. [*Id.* at 22-23]. So, Nuttall explained, if he had overtime, he could have made roughly as much as he did as a Delivery Merchandiser. [*Id.* at 22-23]. Plaintiff disputes this contention, arguing that Cooper worked on average just under 40 hours a week in 2019 when he was a Delivery Merchandiser. [Doc. 42 at 23-24]. The Court is not persuaded that the hours Plaintiff actually worked is the relevant baseline. Regardless, Plaintiff has not shown a comparable, non-customer facing position was available at the time of his reassignment, so the Court need not resolve whether his reassignment necessarily resulted in a pay reduction.

25

### B. Constructive Discharge

Finally, Plaintiff's constructive discharge claim cannot survive summary judgment. To demonstrate a constructive discharge, a plaintiff must adduce evidence to show that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) the employer did so with the intention of forcing the employee to quit. *Morrissey*, 946 F.3d at 303. Such a claim "requires a finding that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* (quoting *Talley*, 542 F.3d at 1107).

Viewing the facts in the light most favorable to him, Plaintiff was transferred to a less desirable position with a lower base pay rate. He cites no other evidence suggesting his work conditions were intolerable or would compel a reasonable person to resign. The Sixth Circuit has explained that "intolerability is a demanding standard." *Id.* at 814. An employee's "subjective discontent does not create an ADA claim." *Id.* The Court finds that a modest pay decrease to a less desirable position is not enough to show that Plaintiff's working conditions were intolerable to a reasonable person. That is particularly so because the warehouse position was not an entry-level job with no special skills or requirements. It still relied on Plaintiff's specialty of being a licensed commercial driver. [Doc. 34-17 at 14]. Moreover, Plaintiff remained on the job for months before resigning for another position, suggesting the position was not intolerable. *See O'Donnell v. Univ. Hosp. Health Sys.*, No. 1:16-cv-2480, 2018 WL 1627436, at *11 (N.D. Ohio April 4, 2018) ("The fact that an employee remains on the job . . . while looking for alternate employment negates any claim that the employment situation was so intolerable as to constitute a constructive discharge.").

Finally, the Sixth Circuit has suggested that "a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show deliberateness necessary for

constructive discharge." *Talley*, 542 F.3d at 1109. As the Court has explained, CCCI did not fail to provide Plaintiff with reasonable accommodation.

### C. Motion for Leave to File Additional Declaration

Pursuant to the Court's Local Rule 7.1, "[n]o additional briefs, affidavits, or other papers in support of or in opposition to a motion shall be filed without prior approval of the Court." E.D. Tenn. Loc. R. 7.1(d). While there appear to be significant disputes surrounding the propriety of the Roberts declaration, the Court finds it unnecessary to resolve those disputes because the Roberts declaration does not change its determination that CCCI is entitled to summary judgment.

Standing alone, filing a declaration after summary judgment briefing has closed is cause for skepticism. Plaintiff represents that counsel communicated with Roberts for the first time on July 27, 2022. [Doc. 47 at 3]. CCCI moved for summary judgment on June 7, 2022, and briefing on the motion was complete on July 5, 2022. So Plaintiff waited over a month and a half after CCCI's motion and three weeks after its reply to speak with Roberts. Discovery had, of course, long since closed on May 10, 2022. [Doc. 29].

Upon review of the parties' arguments, the Court finds no excuse for Plaintiff's delay in obtaining the declaration. Plaintiff alleges that "neither party originally [knew] of his existence relative to this lawsuit" or believed him to have discoverable information. This claim is incredible in light of Roberts's averment that he was Plaintiff's supervisor from 2018 through December 2019. To the extent Plaintiff claims that Roberts only became a relevant witness due to CCCI's reliance on Seiter's affidavit, he still waited a month and a half to contact Roberts. Moreover, CCCI represents that Robert Seiter was disclosed in CCCI's initial disclosures and Plaintiff simply chose not to depose him. [Doc. 52 at 2]. There is, in short, no indication that the declaration "contains new authority or evidence that was not available to the movant in the exercise of

reasonable diligence when the original briefs were filed." *City of Chattanooga v. Walker Cnty. Gen. Water & Sewage Auth.*, No. 1:19-cv-176, 2021 WL 6332536, at *1 (E.D. Tenn. Dec. 13, 2021) (citation omitted).

Finally, CCCI cites the Tennessee Rules of Professional Conduct, which prohibit a lawyer who represents a client from communicating "about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Tennessee Rules of Prof. Conduct 4.2. For companies like CCCI, this prohibition includes officers or managerial agents or employees of the organization. *Id.*, cmt. 7. The parties dispute whether Mr. Roberts is a managerial employee, and few courts have addressed this fact-specific inquiry. The Court will not do so here, having determined the affidavit does not impact the outcome of the motion for summary judgment. Suffice to say that an attorney of record who contacts a supervisory employee of a represented party, regarding pending litigation and without the consent of opposing counsel, does so at his peril. The far wiser course was for Plaintiff's attorneys to obtain the consent of CCCI's counsel before privately speaking with a current CCCI supervisor about pending litigation.

As the Court has explained in different sections of this opinion, the Roberts declaration does not create a genuine issue of material fact. It is, moreover, untimely without sufficient justification. The Motion for Leave to File Additional Declaration [Doc. 46] will be **DENIED AS MOOT**.

## IV. CONCLUSION

Accordingly, CCCI's Motion for Summary Judgment [Doc. 33] is **GRANTED**, and all claims against it are **DISMISSED WITH PREJUDICE**. Plaintiff's Motion for Leave to File Additional Declaration [Doc. 46] is **DENIED AS MOOT.** A separate judgment shall enter.

28

**SO ORDERED**.

/s/ Charles E. Atchley, Jr.
CHARLES E. ATCHLEY, JR.
UNITED STATES DISTRICT JUDGE